IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


**VIRGINIA C. MILLENDER,**
  **Plaintiff,**

**vs.**           **3:06cv205/MD**

**CITY OF PENSACOLA, et al.,**
  **Defendants.**

_____

## MEMORANDUM OPINION AND ORDER

  This case was brought as a civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed this action through counsel (see complaint, doc. 1), but her original attorneys  withdrew, one due to his separation from the law firm that represented plaintiff, and the other due to a conflict of interest.  (Doc. 9, 10, 23, 24).  Plaintiff secured another attorney, who also was permitted to withdraw after plaintiff terminated counsel's representation of her.  (Doc. 35, 36).  Upon consent of the parties the case was referred to the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c). (Doc. 45).   Mediation was unsuccessful (doc. 51), and the case was tried before the court on November 3, 2008 without a jury.

  Pared to its essence, this case involves an allegedly unlawful use of force against plaintiff Virginia C. Millender by Pensacola Police Officer Kristin Brown. Officer Brown deployed her taser against plaintiff on Millender's property on October 30, 2004 after having been dispatched to "ensure the peace."  Plaintiff alleges that this "tasing" was unwarranted and unlawful.  In her three count complaint, she first maintains that Officer (now Sergeant) Brown violated her rights under 42 U.S.C. § 1983 by using excessive force against her.  Her second claim under 42 U.S.C. § 1983 is an official capacity excessive force claim against the City of Pensacola.  Her third

claim is a state law claim for Battery against the City, based on her contention that the civil battery was intentional, although not malicious, and committed within the course and scope of Brown's employment, such that respondeat superior applies.


Legal Standards Governing plaintiff's claims

    Fourth Amendment Standards

    Claims involving allegations of excessive use of force in making an arrest arise under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989); *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Determining whether the amount of force used was reasonable requires a balancing of the government interests at stake with the intrusion on the individual's interests. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871. Factors to be considered include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and whether she is actively resisting arrest or attempting to evade arrest by flight. *Id.* 490 U.S. at 396, 109 S.Ct. at 1872 (citing *Tennessee v. Garner*, 471 U.S. at 8-9, 105 S.Ct. at 1699-1700).

    "[T]he right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871-72; see *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (citing *Graham*). Moreover, "[t]he calculus of reasonableness must embody alloweance for the fact tha tpolice officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397, 109 S.Ct. at 1872. The Eleventh Circuit has recognized that "the typical arrest involves some force and injury." *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008)(quoting *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002)).

    Use of a taser is analyzed like any other use of force, and this court must consider factors such as the severity of the crime, the immediate threat to the officer, the number of times the taser was deployed, any injury sustained by the

arrestee and whether the arrestee was warned of the potential use of the taser.  See *Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir. 2004); *Oliver v. City of Orlando*, 574 F.Supp.2d 1279 (M.D. Fla. 2008).  In *Draper*, an officer effectuating a roadside traffic stop had ordered the motorist, plaintiff Draper, no less than five times to retrieve documents from the cab of his truck.  369 F.3d at 1278.  Draper, whose actions were recorded on the officer's patrol car video, was described by the court as "hostile, belligerent and uncooperative."  *Id.*  He used profanity, moved around and paced in agitation, and repeatedly yelled at the officer, accusing him of harassment.  *Id.*  The Eleventh Circuit found the officer's tasing of Draper, without warning, did not rise to the level of unconstitutional force.  It found that the use of the taser was reasonably proportionate to the difficult, tense and uncertain situation that the officer faced during the traffic stop.  *Id.* The court specifically found that because Draper repeatedly refused to comply with the officer's commands, the officer was not required to start with a verbal arrest command before employing the taser.  *Id.* It also speculated that "a verbal arrest command accompanied by attempted physical handcuffing, in these particular factual circumstances, maybe well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or [officer] Reynolds would be seriously hurt."  *Id.* Therefore, the single use of the taser gun, which did not inflict any serious injury "may well have prevented a physical struggle and serious harm to either Draper or Reynolds."  *Id.*

In a case decided just two months ago, *Buckley v. Haddock*, 2008 WL 4140297 (11th Cir. Sept. 11, 2008),[1] the Eleventh Circuit had the opportunity to revisit the use of tasers during an arrest.  In that case, a motorist who refused to sign a traffic citation was handcuffed and was walking toward the patrol car when he collapsed sobbing onto the ground in the roadway.  The deputy asked the man several times to stand up, unsuccessfully attempted to lift the man to his feet, warned him repeatedly and plainly that the taser would be used if he did not comply, and gave

---

[1]The undersigned cites *Buckley* only as persuasive authority and recognizes that the opinion is not considered binding precedent.  *See* 11th Cir. R. 36-2.

him time to comply before discharging the taser in "stun gun" mode into the recalcitrant motorist's back.  After discharging the taser, the deputy again asked the plaintiff to stand.  Plaintiff did not comply.  He warned him that the taser would be used if he did not stand, and finally discharged the taser for a second five-second burst.  Plaintiff still failed to comply.  The deputy went to his patrol car and radioed for backup before again ordering plaintiff to rise, warning him that a failure to comply would result in his being tased.  The deputy vainly allowed plaintiff time to comply, and again attempted to lift plaintiff to his feet before discharging the taser a third time.  Although plaintiff continued to resist moving to the patrol car, the deputy did not use the taser again.  Once the backup officer arrived, the recalcitrant motorist became cooperative and was escorted without further incident to the patrol car.   The Eleventh Circuit found that the deputy's use of force was not unconstitutionally excessive, and also that in any event, pre-existing law at the time did not clearly establish that the use of force was excessive.  It remanded the case for dismissal of the plaintiff's federal claims against the deputy.[2]

**Florida Law**

---

[2]  Several district courts have had occasion to consider the constitutionality of an officer's use of tasers.  See *Oliver v. City of Orlando*, 574 F.Supp.2d 1279 (M.D. Fla. 2008) (tasing a suspect multiple times while he was on the ground found to be excessive force in violation of decedent's Fourth Amendment rights); *Magee v. City of Daphne*, No. 05-0633-WS-M, 2006 U.S. Dist. LEXIS 93183, 2006 WL 3791971, ----9-10 (S.D.Ala. Dec.20, 2006) (finding qualified immunity where the officers perceived the plaintiff (under arrest for the severe crime of domestic violence) to be argumentative, uncooperative, intoxicated, and having extremely aggravated demeanor; the plaintiff also showed no evidence of injury); *N.A. ex. rel. Ainsworth v. Inabinett*, 2006 U.S. Dist. LEXIS 68003, 2006 WL 2709850 at *5-6 (finding qualified immunity where the officers used a taser only once (after issuing two warnings about using the taser) to subdue a violent, unstable, and threatening plaintiff; the officers had patiently tried using lesser force to compel plaintiff to comply but to no avail); *Dargan v. Hernandez-Vega*, No. 6:05-CV-121-ORL-18JGG, 2006 U.S. Dist. LEXIS 12723, 2006 WL 822558, *8 (M.D.Fla. Mar.24, 2006) (finding qualified immunity because the officers' use of a taser was reasonable where the plaintiff, who did not respond to officers' demands after they threatened to use taser, was not arrested and secured; the one-time tasering, resulting in unsubstantiated injuries, was a marginal use of force under the circumstances); with *Stephens v. City of Butler, Ala.*, 509 F.Supp.2d at 1112-13 (denying qualified immunity where the officers tasered an unarmed arrestee four times; the arrestee made no effort to escape and no movement that could be deemed an attack, and the officers used force only because the arrestee was being verbally unruly and refusing to don jail garb); *Maiorano v. Santiago*, No. 6:05-CV-107-ORL-19KRS, 2005 U.S. Dist. LEXIS 40879, 2005 WL 1200882, *8 (M.D.Fla. May 19, 2005) (denying qualified immunity where the officer tasered the plaintiff without advance warning or a verbal command to desist from engaging in a physical altercation with another student).

Under Florida law, at the time of the events giving rise to this case, section 365.171(16) Florida Statutes provided that the making of false "911" calls was a misdemeanor of the first degree.[3]  Section 843.02, Florida Statutes provided that resisting, obstructing or opposing any officer in the lawful execution of any legal duty is a first degree misdemeanor.  See also *E.W. v. State*, 873 So.2d 485 (Fla. 1st DCA 2004).

A battery claim in which a plaintiff alleges excessive force during an arrest is analyzed by whether the amount of force used was reasonable under the circumstances.  *Dixon v. State*, 101 Fla. 840, 132 So.684 (1931); *City of Miami v. Sanders*, 672 So.2d 46 (Fla. 3rd DCA 1996); see also *Sullivan v. City of Pembroke Pines*, 161 Fed.Appx.906, 911 (11th Cir. 2006) (citing *Sanders*); *Battiste v. Lamberti*, 571 F.Supp.2d 1286, 1306 (S.D.Fla. 2008) (same); *Secondo v. Campbell*, 2008 WL 919718 (N.D.Fla. 2008) (same); *Martinez v. Palm Bay Police Dept.*, 2006 WL 1933812 (M.D. Fla. 2006) (same).[4]  "Traditionally, a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." *Sanders*, 672 So.2d at 47 (citing *Jennings v. City of Winter Park,*, 250 So.2d 900 (Fla. 4th DCA 1971)).  In such a case, the ordinarily protected use of force by a law enforcement officer is transformed into a battery.  *Sanders*, 672 So.2d at 47; *Sullivan, supra.*

## Qualified immunity

Qualified immunity protects law enforcement officials from § 1983 suits for civil damages arising from the discharge of their discretionary functions, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct.

---

[3]The prohibition on false 911 calls has been substantially amended and is now contained within section 365.171.(14), Fla. Stat. (2007)

[4]The undersigned cites the *Sullivan* decision only as persuasive authority and recognizes that the opinion is not considered binding precedent.  *See* 11th Cir. R. 36-2.  Nor are *Battiste*, *Secondo* and *Martinez*.  See *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) (general rule is that a district judge's decision neither binds another district judge nor binds him.)  They are merely cited to show that *Sanders* has been recently followed in all three federal district courts in Florida.

3034, 3038, 97 L.Ed.2d 523 (1987).   Otherwise stated, defendants are entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008).  Qualified immunity affords "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).  Therefore, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer [in defendants' position] to conclude the force was unlawful." *Reese*, 527 F.3d at 1271 (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).  A plaintiff who seeks to avoid summary judgment on the basis of qualified immunity must show not only that the officer violated her federal constitutional or statutory rights, but also that those rights were clearly established at the time the officer acted. *Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008).

<u>Evidence and Arguments at Trial</u>

As noted above, plaintiff Virginia C. Millender proceeded pro se in this action. She testified and called one witness, Russell Pugh.  The defense called Mr. Pugh's sister Lilian Welch, former Pensacola Police Officer Elizabeth Christman, who is currently employed as a special agent with the Department of Alcoholic Beverages and Tobacco, and then-Officer, now-Sergeant Kristin Brown of the Pensacola Police Department.   For the sake of clarity, the testimonial evidence is summarized to reflect chronological order of occurrence of events on the date in question, rather than in the order presented at trial.

Ms. Lilian Welch, who had been a kindergarten teacher for 20 years, testified that she entered into a contract with plaintiff to purchase some furniture in August of 2004.  Pursuant to the contract, which was not entered into evidence, Ms. Welch was to pay $100.00 per month for the furniture until December, when she was to pay the remainder in full.  At some point in either September or October of 2004, plaintiff

contacted Ms. Welch about an overdue payment,[5] which Ms. Welch said she had merely forgotten to make because of the situation after Hurricane Ivan. The two women exchanged words, and plaintiff ended up telling Ms. Welch to just bring the furniture back.  Ms. Welch explained that she had a small vehicle and would need to rent a truck, which turned out to be no small feat after Ivan.  Ms. Welch attempted to return the furniture in mid-October when she first had access to a vehicle that could transport the furniture.  She repeatedly tried to contact the plaintiff, but Ms. Millender did not answer her phone.  Therefore, Welch did not return the furniture at this point.

On October 30, 2004 Welch obtained a rental truck for a couple of hours in the early afternoon.  Her brothers, Sidney[6] and Russell Pugh drove the U-Haul truck to plaintiff's residence, with Welch and her son riding in Welch's car.  After they arrived and observed vehicles at the residence, Welch phoned plaintiff to advise of their presence, but again Millender did not answer the telephone.  The four waited for an unstated amount of time outside the residence until plaintiff Millender exited her house with another woman.  Upon observing Welch and her family, plaintiff asked "Cynthia" to call the police.  Welch testified that plaintiff was laughing at the time, but ultimately her words got ugly and she began cursing at Welch.  Welch's son stood up for her and plaintiff told him to shut up, that he was just a child, although he was around 24 years old in 2004.  Ms. Millender told Welch that the only way she could leave the furniture was if she paid Millender $300.00.

Welch testified that plaintiff was belligerent, hostile and unreasonable, and as a result she just wanted to "cut her losses" and be done with the situation.  So, she went home to get some cash, and retrieved a check that had come in the mail. Because it was a Saturday afternoon, her bank was closed and she had some difficulty cashing the check. Ultimately she gathered the entire $300 that she said plaintiff had requested.

---

[5]From remarks exchanged between the plaintiff and the witness, it appears that a letter that plaintiff had sent Welch was returned marked "return to sender."

[6]Sidney's last name was never mentioned at trial.

Welch testified that *she* called the police so that she would have a witness to what was transpiring.  When asked on cross examination why, if she was so afraid of the plaintiff, that she chose to come back, Welch reiterated that plaintiff's unreasonable attitude was the reason she had asked for police assistance.  Defendant's exhibit 8 was a copy of the tape of a call made by Ms. Welch to the Pensacola Police Department.[7]  Part of the call apparently was not recorded.  The recording reflects that Welch was briefly put on hold, and when she began talking to the dispatcher, Welch made reference to the fact that she was "just was talking to the officer now."  Ms. Welch explained that she was trying to return someone's property as they had requested, but the woman was very hostile and belligerent.  Welch said that she wanted to go back and try again, and she requested that an officer be sent to assist her.  Ms. Welch provided plaintiff's address and told the dispatchers that her brothers were there with the property in a rental truck.  She indicated that she was on her way back to plaintiff's residence and the dispatcher assured Welch that she would have an officer head that way.

When Welch testified that she was gone for probably an hour trying to gather the funds plaintiff had requested.  She got back to Millender's residence and waited in her car on the street for law enforcement to arrive.  Officer Elizabeth Christman responded to the scene, and Welch explained the situation to her.  Welch denied ever having seen Christman before or after the incident except one time when Welch went to the police station to talk to Christman about being a witness in county court in a civil case involving Welch and Millender's dispute over money owed for the furniture.

When Welch and the officer approached plaintiff, plaintiff told Officer Christman to leave.  Christman explained that she had a right to be there, and admonished plaintiff to be quiet, at which point plaintiff said words to the effect of "arrest me then."  Welch asked plaintiff for a receipt for the money she was about to give plaintiff, and a written statement that she owed nothing.  Plaintiff refused, saying that she wanted full payment.  Because plaintiff was never willing to give

---

[7]The call was not made to the 911 line.

Welch a receipt of any kind, Welch did not give plaintiff the $300.  Welch described plaintiff's communication style as "just cursing, period."  She stated that Officer Christman finally told Welch's son to take her home as she was upset.  Welch denied having seen any other officer there, or any use of force against the plaintiff.

On cross-examination, Welch was asked about the size of her brothers and her son, and plaintiff insinuated that Welch should not have been afraid of a 135 pound woman under the circumstances.[8]  Welch reiterated that she chose to call the police because of plaintiff's attitude.  At the end of the cross-examination, the animosity between plaintiff and this witness became undeniably apparent from the argumentative nature of the exchange between them, and the court cut off questioning and directed the witness to leave.

Russell Pugh, Ms. Welch's brother, was under subpoena by the defendants, but testified in plaintiff's case in chief.  He was the only other witness to testify about the events leading up to Officer Christman's arrival on the scene.  Mr. Pugh, who used to attend the same church as plaintiff, explained that after he, his brother, sister and nephew arrived at the plaintiff's house, words were exchanged between the plaintiff and his sister.  He stated that the hard feelings were obvious from the tone and body language.  He recalled that at one point Ms. Welch's son displayed aggravation and was "verbally restrained."  However, he testified at least twice that plaintiff was not nasty or hostile.

Mr. Pugh and his brother waited at plaintiff's residence while his sister and nephew went to get the money plaintiff had requested.  She was gone about 30-45 minutes, during which time he and his brother talked to Millender and Cynthia Hogan, took the furniture off the truck  into the garage, and looked at other furniture. He hesitated at times during his testimony, as his recollection appeared to have faded, but in response to plaintiff's question, he said he thought he maybe recalled that Welch called him and said she was on the way back to plaintiff's residence with the police.

---

[8]The police report listed plaintiff's weight as 160 pounds.  (Court exh. 1).

According to Mr. Pugh, Officer Christman, who he did not identify by name, arrived at the same time or shortly before Welch returned.  He recalled plaintiff telling Christman to leave, and Christman responding that she did not have to leave. In his opinion, Christman appeared to be playing the role of "mediator."  She asked questions about money being exchanged and said that Welch did not need to pay the plaintiff for the furniture.  Plaintiff became upset and told the officer that it was not her duty to determine who owed money, and Christman allegedly responded that plaintiff had her furniture back so it did not seem like she was owed any money. Pugh testified that Christman said the matter could be resolved in small claims court, and told Welch that if this happened, she could be a witness in her behalf.  In Pugh's opinion, Officer Christman "took sides."  Finally, Christman asked Welch's son Everett to leave because he was too "riled up," and not contributing to the situation being a smooth transaction.  Pugh left as well.  When he left, Officer Christman was still there.

Pugh had difficulty recalling how he had learned about Millender's tasing and the arrest, at first stating that he learned only when he got subpoenaed for depositions, then correcting himself to indicate he had read about her arrest in the newspaper and learned of the tasing later.  When asked if he had run into Christman at a CVS drug store, he said he did not recall this.  He also did not recall telling Hogan that it was a shame what Welch and Christman did to Ms. Millender.  He said that he vaguely remembered saying Welch and Christman laughed about the tasing.

On cross examination, Pugh testified that he remembered seeing Officer Brown at the scene, although he did not have much contact with her.  He estimated in response to counsel's question that she was there only for the last third of the incident, and he did not recall her doing anything.  He described Christman's demeanor as "stern," and stated that in his opinion Christman took his sister's side at the time.  He first testified that she and his sister became buddies afterwards, later conceding that they were not really "friends."  He indicated that the plaintiff never used profanity.  When Welch's son said plaintiff was crazy and money hungry plaintiff told him to leave.

Neither Welch nor Pugh testified about plaintiff making any phone calls while they were on her property.

Before presenting testimonial evidence, plaintiff introduced as composite exhibit 1, tape recordings of three 911 calls she made on the date in question.  In the first call, she reported that a Pensacola police officer (Officer Christman) was on her property harassing people who were there and would not leave.  She asked that an officer be dispatched to arrest Officer Christman.  In the second call, she complained that Lilian Welch had left furniture in her driveway, said that Ms. Welch needed to come and get it, and provided Ms. Welch's home address to the dispatcher.  In the third call, she again requested that a police officer come to her house as a result of the furniture having been left in her driveway.  The dispatcher informed Millender that the matter was not an emergency and provided her with the main police number.

Plaintiff's exhibit 2 was a tape recording of a call she made to the Pensacola Police Department.  Plaintiff stated that she needed an officer to come to her house "pertaining to an officer who just left" her house.  During this call, plaintiff told the dispatcher that the officer had returned, at which point the dispatcher told her to talk to the officer.  Plaintiff said she would not talk to the officer, that she had told her to leave but she did not.  The dispatcher advised that a sergeant would come out to her property.  Plaintiff also again complained about the furniture being left in her yard and the fact that Officer Christman had told the people to leave the furniture there and leave, and was told to discuss this with the officer who came out to her property.

The arrest report prepared by Officer Christman was marked as court exhibit 1.

Plaintiff's composite exhibit 3 is comprised of nine[9] pages of photographs, some of which are included in other exhibits.  The first photograph shows the plaintiff holding a "land-line" phone with a cord, while standing to one side of the staircase leading down from her home.  The second picture shows plaintiff sitting

---

[9]At trial, the plaintiff indicated that there were 8 photographs.  There are 8 different photographs, but one of them appears twice, so there are nine pages.

on the top step of the staircase.  The third picture shows what appears to be a "weeping" puncture wound on plaintiff's right forearm, and plaintiff seems to be wearing a hospital identification bracelet.  The fourth picture shows a scrape on plaintiff's left elbow.  The fifth picture depicts what appears to be a bruise on plaintiff's left shoulder.  The sixth picture shows plaintiff's left knee, which has some faint reddish marks, possibly scrapes.  The seventh picture shows scrapes on plaintiff's left elbow.  The eight picture is the same as the sixth, although it is darker, such that the marks on plaintiff's left knee appear more pronounced.  Finally, the ninth picture shows what seems to be a bruise or scrape on the inside of plaintiff's right thigh.

Plaintiff's exhibit 4 is a copy of the official court docket from the trial of the charges against her for making false 911 calls and for resisting arrest without violence.  This document reflects that the court granted plaintiff's motion for judgment of acquittal on the charge of resisting arrest, and found her not guilty with respect to the false 911 calls.

Plaintiff then took the stand to testify in her behalf.  She stated that on October 30, 2004, officers Christman and Brown entered her back yard while she was sitting on the top of the steps.  Officer Christman told her to come down, and plaintiff indicated she was on the phone.  Officer Christman told plaintiff that she did not care, that plaintiff needed to come down "now."  Plaintiff stood up and started down the stairs, at which point she was tased by Officer Brown.  She fell down the stairs and to the ground.  Brown told her to roll over, plaintiff said that she could not and Officer Brown said she would help her.  Christman shouted to Brown to turn plaintiff loose.  Officer Brown helped plaintiff to stand and handcuffed her hands behind her back.  At this point, plaintiff testified that Officer Christman asked her about her purse, and when plaintiff indicated that it was upstairs, she was taken upstairs to retrieve it.  Christman told plaintiff that they were taking her to jail, and when plaintiff asked why, Christman merely stated that Millender would find out why later.  Officer Brown removed the two taser probes from plaintiff's body and cleaned her up a little with a paper towel before plaintiff was transported to jail.  Plaintiff testified that

Officer Brown was her "guardian angel." She explained that after the tasing incident, Brown did not take her hands off plaintiff, and plaintiff feared that if Brown had, that Christman would have tased her.

Christman put Millender in her marked patrol car, and then placed plaintiff's purse on the trunk of the car and rifled through it.   Plaintiff observed another patrol car pass by and continue on.  During the ride to the police station, plaintiff testified that Christman called dispatch and asked how many 911 calls were made.  Once they arrived at the station the doctor came out to see the plaintiff.  Christman made a phone call from the station lobby and plaintiff overheard her say "We got her.  I didn't have to–Brown did."  While the booking officer was looking through plaintiff's purse and the two discussed money plaintiff had in the purse, Christman told plaintiff that she had better not say Christman was trying to take plaintiff's money.

Finally, plaintiff stated in her direct testimony that when the law enforcement officers approached, she was on the phone with the 911 dispatcher.  She denied having turned to go back inside as was stated in the arrest report, noting that the photographs showed that she was tased from the front.  She offered no evidence with respect to damages that she allegedly suffered.

On cross-examination, defense counsel inquired about plaintiff's comment that Officer Brown, the defendant in this action, was plaintiff's "guardian angel." Plaintiff explained that once Brown had tased her, she never took her hands off the plaintiff.  Plaintiff stated that she felt Brown was protecting her from further injury, and that if Brown had backed away from her that Christman would have tased her.  Plaintiff believed that Brown's decision to tase her was based on what she heard from Christman and others before coming into the plaintiff's backyard.  Plaintiff denied having had any prior experience with either of the officers before that day, so there was no reason to suspect any "hard feelings" on the part of the officers.

Additional photographs of plaintiff's injuries were introduced on cross-examination.  First, counsel referred to the third and fourth photos in plaintiff's composite exhibit 3.  Plaintiff identified the third photo as depicting one of the taser

wounds in her left arm, and the fourth as showing where she bumped her elbow. Plaintiff's exhibit 5 contained two photographs, one showing a bump on plaintiff's forehead about the size of a 50 cent piece, and one displaying the taser mark in her abdomen above her panty line.  Exhibit six contained pictures of the inside of plaintiff's right leg and her left shoulder, both of which were also included in exhibit 3.  Exhibit 7 showed a picture of plaintiff's left knee that had been included in exhibit 3 and another picture of plaintiff's face showing the bump on her forehead.  Exhibit 8 showed two views of bruises and scrapes on plaintiff's left elbow.

In response to defense counsel's questions, plaintiff admitted that she had suffered no loss to the five senses, she had not had to spend the night at the emergency room, that she had no surgery, no continuing brain injury, and that she did not claim any loss of wages or income.  With respect to continuing injuries, she said only that the knee upon which she had previously had surgery was aggravated by the incident.

Former PPD Officer Elizabeth Christman was the second witness to testify for the defense.  Christman stated that she has been a special agent with the Florida Division of Alcoholic Beverages and Tobacco for one and a half years after working for the Pensacola Police Department for 8 ½ years.  She stated that she did not know either plaintiff or Lilian Welch before the incident and had no contact with either woman afterwards.  Christman testified that she received a dispatch call requesting an officer to stand by to ensure the peace, and reported to plaintiff's home in response to this call around 2:00 p.m. on October 30, 2004.  When she arrived, Ms. Welch was in her vehicle out in front of the house, and two men were unloading furniture from a U-Haul.  Christman parked in the road and approached Ms. Welch, who explained the situation to her.  She told Welch to continue unloading the furniture and let her know if she was needed.

At some point, plaintiff Millender approached and cursed at Christman, and told her to leave plaintiff's property.  Christman calmly informed plaintiff that she was there to ensure the peace, but plaintiff continued to yell at her.  Plaintiff became louder and more intense, and Christman told her to calm down.  Plaintiff did not

comply, and continued to yell and curse, becoming louder and angrier.  Officer Christman observed Welch ask plaintiff Millender about payment or a receipt and that plaintiff refused to either take Welch's money or give her a receipt.  Christman told Welch that the furniture was there, and if she did not want to leave the money with Millender without getting a receipt, that was reasonable.  Finally, Christman told Welch, her brothers, and her son to leave, and they walked to the end of plaintiff's driveway.

Christman entered her marked patrol car and began to communicate with dispatch as she prepared to leave the scene.  Plaintiff yelled at her to stop, and told Christman to stay because she would be arrested.  Plaintiff told Christman that another law enforcement officer was on the way to arrest her.  Christman called her sergeant who told her to leave if plaintiff had no emergency, but ultimately directed Christman to arrest the plaintiff because of the false 911 calls, which Christman admitted that she had not heard.

Officer Kristin Brown, the officer with the adjacent beat and a friend of Christman's,  arrived at the scene to provide back-up.  Plaintiff had walked away, so the two officers proceeded up the driveway towards the residence where they found plaintiff on the steps in her backyard, about halfway down.  Christman told plaintiff that she needed to come down the steps so that they could see what was going on. Officer Christman explained that at this point it would have been imprudent to advise plaintiff that she was about to be placed under arrest because she could have turned and fled into the house, or it was possible that either plaintiff or the officers or both could have been injured if a struggle ensued on the staircase.  Plaintiff descended the stairs but continued to be verbally aggressive.  Christman was at the bottom of the stairs, and the three women moved off to the side after plaintiff came down.  At the time, plaintiff was carrying her cordless housephone, a set of keys, and some papers and a pen.  Christman told plaintiff to drop the items she was holding and plaintiff responded "I ain't doin' shit."  When queried by counsel, Christman clarified that she used "command voice" to tell the plaintiff three times to drop the items she was holding and that Officer Brown did the same.  During her testimony, Christman

stood to demonstrate the plaintiff's stance at the time, which she described as aggressive, kind of like a "football stance."  When plaintiff failed to comply with Christman's commands to put down the items in her hand, Brown took out her taser and twice told plaintiff to drop the items in her hands or she would get tased.  When plaintiff refused to comply, Brown deployed her taser. The officers were then able to effect the arrest.  The defense introduced a copy of the offense report and Officer Christman's typed report charging plaintiff with making false 911 calls and resisting arrest without violence.  (Defendant's exh. 2 & 3).  Finally, Christman testified that plaintiff was not on the stairs when she was tased, because officers are taught not to tase suspects on stairs due to the increased possibility of injury.

On cross-examination Officer Christman reiterated much of her direct testimony. She admitted in response to plaintiff Millender's question that she was not licensed to resolve a contract dispute.  Christman said she did not recall whether plaintiff was on the phone when she was sitting on the steps as the officers approached.  Christman indicated that she was certain that plaintiff was nowhere near the stairs when she was tased.  Plaintiff attempted to make the point that if she had turned to go up the stairs as was reflected in the arrest report (defendant's exh. 3), she would have been tased in the back.

Christman says that she placed plaintiff in handcuffs at the scene.  She stated that plaintiff asked about her purse, so she took plaintiff to retrieve it before transporting her to the Escambia County Jail.  Christman did not observe that plaintiff was bleeding, but she saw that she had urinated on herself when she was tased.  Officer Christman did not recall calling dispatch during the ride to the station to see how many times plaintiff had been tased, and did not recall making a phone call while in the jail lobby, as testified by plaintiff.  She did recall going through plaintiff's purse on the trunk of her car pursuant to standard operating procedure to check for weapons, drugs, etc., and saying to plaintiff at the jail that plaintiff had better not be saying that she stole any of plaintiff's money.  Finally, Christman described plaintiff's demeanor that day as loud, belligerent and aggressive in her choice of words, and described her own actions as "keeping the peace."

      Then-Officer Brown was the last witness to testify.  She was promoted to the rank of sergeant 2 ½ years ago, and has a total of 12 ½ years experience with the Pensacola Police Department in a variety of capacities, including patrol, where she was serving at the time of the incident in question.  Brown testified that she was the first one to arrive after the call that Christman was about to be arrested.  Her beat was adjacent to Christman's so she was closest to the scene and decided to go.  She parked on the street near Christman's vehicle around the time that the sergeant instructed Christman to arrest the plaintiff.  Brown, who did not know the plaintiff or any of the other witnesses before the date of the incident, followed Christman back to plaintiff's patio.  The officers found plaintiff sitting on her steps, and Christman ordered plaintiff to come down.  Brown observed a cordless house phone, keys, pen, and papers in plaintiff's hand.  Plaintiff complied with the directions to come down the stairs, although Brown described her demeanor as "angry" and "agitated."  Brown knew that they were "luring" plaintiff down the stairs in order to effectuate a safer arrest.  Plaintiff stepped away from the stairs onto the patio, near a metal table and chairs.

      Once Ms. Millender was down the stairs, Christman ordered her to put down the items in her hands, but Millender refused, saying she wasn't "going to do shit."  At this point, Brown described the situation between plaintiff and Christman as a "stand-off" because plaintiff refused to obey Brown's commands.  She explained that the time for negotiations had passed.  When questioned about how long had elapsed, she said only about 3 minutes, but that was 2 ½ minutes too long.  She explained that several of the items plaintiff was holding had the potential to cause injury, whether used as projectiles or as weapons used to poke or stab.  Although Brown was not involved in the decision to arrest, which was made just as she arrived on the scene, she was the officer who decided to use force.  As Christman gave the repeated commands and plaintiff failed to comply, Brown took out her taser and announced "Taser."  This "announcement" is made for the safety of the officers.  Brown then told plaintiff, twice, to drop the items or she would be tased.  Even

though the second command was given very loudly, plaintiff still did not comply, so Brown activated the taser.

When the prongs of the taser struck their intended target, plaintiff went rigid and fell backwards to the right side, hitting the metal chair, and then fell to the pavement.  Brown explained that she used "prong tasing," which disorients the entire central nervous system for about five seconds.[10]  Brown testified that her M-26 taser had the capacity for multiple deployments if the resistance did not cease, but that she deployed it only a single time against Ms. Millender.  She indicated that officers are trained to only tase once, and that once the resistance stops, the use of force must stop, and the officer effectuates the arrest.

In explaining her decision to use force, and specifically the taser, Brown testified that she felt that plaintiff was a danger to the officers because she was not obeying commands and that physical control was needed.   A taser, according to Brown, is safer both for the arrestee and for law enforcement officers, as a hands-on scuffle could result in more serious injuries.   In her opinion, this situation was perfect for use of a taser.

Brown said that she personally had the experience of being tased as part of her training for the instructor's course.  This effected her by knowing what to expect from the subject afterwards.   Brown explained that after the five seconds of disorientation produced by the taser, she ensures she has her hands on the subject, in this case plaintiff Millender.  When the subject comes to, Brown is able to let her know that she will get through the experience, that Brown will help her so she will not be tased again, and that she will be arrested without further incident.

On cross-examination, Brown testified that she came to plaintiff's home to back up Officer Christman.  She said that Christman told her that they were going to arrest plaintiff, but stated that she was not told that they were going to tase the plaintiff.  She did not recall whether plaintiff was on the phone when the officers entered her back yard. She admitted that plaintiff came down the stairs willingly

---

[10]Contact tasing, on the other hand, is a localized application, where the taser is applied directly to the target.  It obviously requires that the officer be much closer to the target.

when directed to do so, but reiterated that when plaintiff was told to put down the items in her hand, she indicated that she would not do so.  Brown testified that she and Christman both weighed about 200 lbs. at the time, and that plaintiff probably weighed 150 lbs.  Brown also reiterated that she chose to use the taser as it tends to produce less physical injury than hand to hand confrontations.  She did not want things to get worse than they already were as there was a question in her mind about whether plaintiff might flee because of her level of agitation.  Because plaintiff was opposing arrest and holding weapons, the officers were entitled to use force at that point.  The taser, in her opinion, was the safest tool.  She explained that plaintiff was facing the stairs and she was to plaintiff's right, about six or seven feet away.  Upon deploying the taser, 26 watts were delivered in a 5 second burst.  Brown re-explained the sequence of events after the tasing, including plaintiff's physical reaction to the taser and the assistance Brown provided to plaintiff, both in helping her to stand, attempting to clean her up, and accompanying plaintiff up the stairs to locate her purse.  Finally Brown denied that Christman had "used" her to do Christman's "dirty work" of tasing the plaintiff.

In her closing argument Virginia Millender stated that Officer Brown had the legal duty to use only the force necessary to effect the arrest.  She contrasted felony and misdemeanor arrests and stated that a misdemeanor must be committed in the presence of a law enforcement officer, and therefore there was no legal grounds for an arrest.  She claimed that Brown acted with deliberate indifference to her safety, and that she could have been arrested without a use of force, or with a lesser degree of force than that encompassed by the taser.  Plaintiff argued facts not in evidence including that Brown attended 7 hours of taser training, that Brown could bench 150 lbs and therefore should have been physically capable of arresting plaintiff without force, and she referred to a Police Department Policy 203 (which was not introduced in evidence) and claimed that the degree of force used against her exceeded that authorized by this policy.

Counsel for the defendants argued, in essence, that defendant Brown's use of force was controlled, reasonable and not violative of the constitution.  In favor of

the determination of reasonableness, he also notes that Florida law regarding use of tasers had changed since the time of the incident, and that current law forbids law enforcement officers from using tasers unless they encounter actual physical resistance.

Findings of Fact

Having considered the pleadings, the trial testimony, exhibits, and closing arguments of the parties, the court determines the following facts by a preponderance of the evidence.  On October 30, 2004, Lillian Welch called the Pensacola Police Department requesting the presence of an officer at the home of plaintiff Virginia C. Millender.  Ms. Welch wanted an officer to stand by as she attempted to return some furniture to Ms. Millender, whom she is heard describing to the dispatcher in the recorded conversation as acting "belligerent" and "hostile." Ms. Welch, her son, and two brothers were at plaintiff's home with a U-Haul truck containing the furniture when Officer Elizabeth Christman was dispatched to the scene in order to keep the peace.  The court credits the testimony of Ms. Welch and Officer Christman about plaintiff's attitude and demeanor over that of plaintiff and Russell Pugh, in part due to the recordings of phone calls made by both Millender and Welch contemporaneous with the events that occurred four years ago.  There is no dispute that plaintiff asked Christman to leave her property and the court credits Christman's testimony that plaintiff became verbally belligerent towards her. Christman did not leave as plaintiff requested, asserting her right to be there as an officer of the law in order to keep the peace.  The plaintiff's furniture was unloaded, with some of it remaining in her driveway, and Welch, her brothers, and her son left the scene.  Welch, who had attempted to pay the plaintiff $300 at the time, left without giving plaintiff any money.  As Officer Christman retreated to her patrol car to check in with dispatch and close out the call, plaintiff made three calls to 911.  In the first call, she asked that an officer be dispatched to arrest Officer Christman, and in the second and third calls she complained about the furniture that had been left in her driveway by Ms. Welch.

While Officer Christman was sitting in her patrol car at the end of plaintiff's driveway, Christman was advised by her superior officer that she should arrest the plaintiff for making these non-emergency 911 calls.  Followed by her friend and fellow officer Kristin Brown, who had arrived on the scene as a backup officer, Christman walked up the driveway and entered plaintiff's backyard.  Although not critical to plaintiff's position, the court credits plaintiff's testimony that she was on the phone with the non-emergency police dispatcher at the time, which is corroborated by the tape of the call.  The parties do not dispute that plaintiff was sitting on her steps, although they disagree about exactly where she was sitting.  In any event, the court finds credible the testimony of the two officers that plaintiff responded to Christman's order to come down the steps, carrying a cordless house phone, keys, a pen and some papers, although she remained agitated.

Millender subsequently disregarded Christman's repeated and increasingly forceful orders to put down the items in her hand, some of which the officers reasonably believed could have been used as weapons.  The stand-off had lasted several minutes at this point.  The officers had several use of force options available to assist them in effectuating the arrest.  Using a taser to quell resistance can often avoid serious injury to the arrestee and the officers, and is invaluable in avoiding a "hand to hand" scuffle.  Therefore, Brown, who had taken a taser instructor's course and herself had the experience of being tased, unholstered her taser and warned plaintiff that if she did not put the items down she would be tased.  When plaintiff failed to comply with Brown's first command, Brown repeated the command and warning in a louder voice.  Brown was standing towards plaintiff's right side as plaintiff faced the stairs.  Plaintiff still failed to comply, and Brown discharged her taser a single time.  The two prongs from Brown's taser were expelled from their cartridge and lodged in plaintiff's right elbow and right abdomen.

After Millender was struck by the taser, she went rigid and fell to the ground where she was standing near the bottom of the stairs.  After tasing the plaintiff, Brown remained by plaintiff's side, assisting her to roll over, stand up, and climb the stairs to enter the house to retrieve her purse.  Brown also cleaned plaintiff's

wounds using paper towels before plaintiff was placed in Christman's police cruiser for transport.  Brown was described by plaintiff as her "guardian angel," and there is no record evidence that she displayed any malice at any point during the event. Plaintiff was charged with making false 911 calls and resisting or opposing a law enforcement officer in the lawful performance of her duties in violation of § 365.171(16) and § 843.02, Florida Statutes, respectively.

As a result of the tasing and her subsequent fall, plaintiff suffered a bump on her forehead, lacerations on her right elbow and right abdomen where she was struck by the taser, and minor bruises or scrapes on various parts of her body. Neither officer punched, hit, kick, beat or otherwise struck plaintiff during the incident.  She suffered no fractures or any injuries requiring hospitalization, and there was no evidence that any of her alleged injuries were from anything other than the single taser impact and the resulting fall.  Finally, plaintiff did not claim lost earnings of any kind from the incident.

No evidence was introduced with respect to the Pensacola Police Department and its customs, policies, and practices, and the court makes no findings thereon.

## Defendants' Fed.R.Civ.P. 52(c) motion

After plaintiff rested, defense counsel moved for judgment on partial findings in a non-jury trial pursuant to Fed.R.Civ.P. 52(c)[11] as to the City of Pensacola on count two of the complaint.  This subsection provides as follows:

> **Judgment on Partial Findings:** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however,

---

[11]This subsection provides as follows:
**Judgment on Partial Findings**: If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).
Fed.R.Civ.P. 52(c).

> decline to render any judgment until the close of the evidence.  A
> judgment on partial findings must be supported by findings of fact and
> conclusions of law as required by Rule 52(a).

Fed.R.Civ.P. 52(c). The court granted the motion.

It is well established that municipalities cannot be held liable for the acts of their employees under the theory of *respondeat superior*.  *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978); *Skop v. City of Atlanta,* 485 F.3d 1130, 1145 (11th Cir. 2007); *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005) *(citing Samples v. City of Atlanta*, 846 F.2d 1328, 1333 (11th Cir. 1988)).  Instead, they are subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury[.]" *Monell*, 436 U.S. at 694, 98 S.Ct. 2037-2038.  As noted by defense counsel, the plaintiff introduced <u>no</u> evidence of any policy or custom that inflicted the alleged injuries in this case.

When plaintiff was asked to respond to defendant's motion, she stated words to the effect that she had more evidence against Brown, and that she thought the civil rights case would come next.  The court explained that the entire case proceeded at one time, and due to the utter lack of evidence that would support a finding of official capacity liability on the part of the defendant City, orally granted the defendants' motion at that time.

<u>Conclusions of Law</u>

It is undisputed that Officer Brown was engaged in a discretionary function at the time she tased plaintiff.  The court finds that plaintiff has failed to prove by a preponderance of the evidence that Officer Brown's single discharge of the taser was an excessive use of force in violation of plaintiff Millender's Fourth Amendment rights under prevailing Eleventh Circuit or Supreme Court law.  Plaintiff failed to respond to the lawful commands of Officers Christman and Brown who were about to effectuate an arrest.  The officers had reason to believe that the items plaintiff was holding could have been used as weapons.  The method of force chosen by Officer

Brown was controlled and reasonable under the circumstances, and aimed at avoiding a physical confrontation that could have led to greater injury for either party.   Officer Brown's actions were reasonable under and consistent with controlling law.   Therefore, plaintiff has failed to establish any constitutional violation, much less a violation of a right that was clearly established at the time of the incident at issue.  Plaintiff's Fourth Amendment claim against Officer Brown thus fails.

Similarly, plaintiff's state law claim for battery against the City of Pensacola also fails.  The court finds that Brown's use of the taser was reasonable and utilized to accomplish lawful objectives, ie. the arrest of plaintiff Millender.  Therefore, because the force used was neither excessive nor unreasonable under the circumstances, it does not rise to the level of establishing an actionable state law claim for battery.

In light of the foregoing, judgment should be entered in favor of the defendants, and against the plaintiff. Defendants are also awarded costs as provided by law.

Accordingly, it is ORDERED that a Verdict is entered in favor of the defendants Kristin Brown and the City of Pensacola, and the Clerk is directed to enter judgment in favor of the defendants and against the plaintiff.  Defendants may move for an award  of costs and attorney's fees as provided by law within 30 days from the date of this order.

DONE AND ORDERED this 14th day of November, 2008.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**